## GRANT.

WETMORE, appellant, *v.* WHITE and WHITE JR., respondents.

2 C. C. E. 87–110.  Chancellor's opinion id. 91.

*Grant of Interest in Mills and of Water Course, as Incident; Specific Performance.*

THE appellant being seised of 250 acres of land on the east side of Saghquate creek in Whitestown, together with half the soil under water, and the respondent White, senior, the father, being seised of 300 acres on the west side, with the other half of the bed of the creek; they entered into a verbal agreement, in the year 1787, to divert, on their joint account for the use of mills to be erected, the water of the stream to such spot on the land of either, as should in the opinion of one Beardsley, be most proper for the site of a mill. The latter fixed upon a spot on the land of Wetmore. Wetmore, White senior, and Beardsley, then, 13th of May, 1788, executed a written agreement to build a grist mill on

Wetmore's land, a few rods north of his house; he and White to "*own*" each one fourth of the mill, in consideration of furnishing all materials, &c., and erecting the dam to turn the water of the creek; Beardsley to own the other half on doing the carpenter's work, &c. Upon these terms, the mill and dam being completed in 1788, it was verbally agreed between the *same parties*, to build adjoining to the grist mill a saw mill, to be supplied with water in the same manner, and to be "*owned*" in equal proportions by the three. This also being carried into effect, the mills were used in the same manner for about three years; when, being very much out of repair, Beardsley, in 1791, transferred his interest in them for $600 by release to the appellant, who shortly after bought the interest of White, senior, for $187, and paid the money, but received no conveyance of it, nor was anything said of the right to the water of the creek.

The appellant repaired the grist mill and entirely rebuilt the saw mill and quietly enjoyed both, for the space of one year, when they were accidentally burnt down.

The appellant then, at great expense, rebuilt them and continued in the enjoyment of the mills and of the use of the water of the creek, until August, 1797, when the respondent Hugh White, the father, threatened that he would cut down the dam and deprive the appellant of the use of the water, unless he would become a *Presbyterian*, and join the congregation under the charge of the Rev. Bethuel Dodd, and that he would also build a dam and turn one half of the water of the creek over a meadow contiguous to the Saghquate creek, and adjoining to the dam erected for the use of the mills; which meadow on the 25th of April, 1794, the father had, in consideration of blood and affection, conveyed, with a moiety of the waters of the creek, to his son Hugh White, junior, the other respondent.

In September and October, 1797, the dam across the creek, was, to the great injury of the mills, three times cut through and the water permitted to escape.

On the 5th of December, 1797, the appellant filed a bill in Chancery, stating these circumstances, praying an injunction to restrain the respondents from molesting or disturbing him in the enjoyment of the mills, mill-dam, and the water

of the creek, that he might be quieted in his possession of them, and for such further and other relief as the court might please to direct.

The answer of the respondents admitted the parol agreement to erect the mills and dam ; the written agreement, the sale by White, senior, " *of his shares in the mills;* the payment of the consideration money; that the mills were burnt down and rebuilt, &c., but denied that the *right* or *privilege* in the waters of the creek had ever been parted with to the appellant, or that he had paid any consideration for it ; or, that he had any right to appropriate the waters of the creek to the use of the mills ; or to maintain the dam for the purpose of turning the stream from its usual course. That soon after the destruction of the mills, White the father explained, as he believed, in a conversation with the appellant, the nature of the contract for the sale of the mills and then utterly denied the appellant's right to the water; that the appellant had never requested a conveyance of the right of water, and had from a consciousness of his having none, erected a temporary dam at his own expense, below that for the use of the mills, in order to turn the water into the respondent's meadow, the want of which, in consequence of the upper dam, actually injured the crop of hay, and could not be compensated for, by even $1,500. They also insisted on the statute of frauds.

From the testimony of two of the witnesses, it appeared that the understanding of the parties at the time of the first parol agreement was, that wherever they were built, " there the waters were to go." That Beardsley who was examined as a witness, considered the *right to the water* as perpetually annexed to the mills, and never entertained any apprehension of its being liable to be taken away.

Upon this state of facts and the proofs, the Chancellor *dismissed* the bill with costs. See opinion of Chancellor Lansing, 2 C. C. E. 91.

1. As to the parol agreement, he said "Upon the whole, I do not think the parol agreement is made out in proof; admitting the evidence to be competent to sustain its variant from or enlarging the written contract, and the parol contract admitted by the answer, relating to the saw mills. It

is therefore unnecessary to examine the influence of the statute of frauds and perjuries on the case."

2. As to the written contract.

" This has no words evincive of the intent of the parties to perpetuate this joint interest, beyond the duration of the mill, which was the object of it." " The mills were destroyed by fire ; and White, senior, declares in his answer that he informed the appellant, before he rebuilt them, that the water was his, and that he had *not* sold it. This rebuts the deduction which might otherwise be made from his tacit acquiescence in the rebuilding of the mills. I am persuaded that the better construction is that the reciprocal interests of the parties were to be affected merely, while the principal objects of this enterprise, the mills, endured; that those destroyed, it ceased to operate."

From this decree Wetmore appealed ; a few extracts from the opinion of Thompson, J., who delivered the only one, will sufficiently show the grounds of *reversal*.

*Per Curiam*, delivered by Thompson, J. " The controversy between these parties presents the following questions for examination. 1. Whether the respondent ever acquired any right to the waters of the creek for the use of the mills? 2. If so, whether it was a temporary or permanent right? 3. Whether, the purchase being by parol, the respondents can avail themselves of the statute of frauds to avoid it?

He then shows that from the evidence and the acts of the parties in digging a canal and erecting the dam, " that there was an *agreement* to divert the natural course of the creek, the object of which clearly was for the use of the mills. By a sale of the mills, generally, I should therefore incline to think the water would pass as an *incident* to them, without any special provision. Indeed it was not denied on the argument, but that the appellant had acquired a right to the use of the water, co-extensive with the duration of the first mills built."

" But it is not necessary to say, the right to the water passed as an incident to the mills, in the sense above mentioned : or, that the appellant acquired this right, at the time he *purchased* the mills. It was, I think, amply secured by a prior contract." " I consider the effect of this *agreement*

as an *appropriation of the water* to the use of the mills; that it thereby became, in some measure, an appurtenance to them; and that, under such circumstances, a grant of the principal subject would pass the water, as an *incident*."

"The next inquiry is, whether this contract vested a permanent, or only a temporary right to the use of the water?" After reviewing the evidence as to this, he says: "The conduct of White, in not disclosing to Wetmore, at the time of selling [his interest in] the mills, his claim of restoring the water to its original channel; his sleeping so long upon his claim; and permitting the appellant to expend his money in repairing and rebuilding the mills; these were unconscientious, and form strong grounds for the interposition of a court of equity."

"The appellant's claim resting altogether upon parol contracts, it becomes necessary to examine whether any obstacle to relief is interposed by the statute of frauds? I think there is not. The consideration money has been paid; possession has been taken; and valuable improvements made. I can therefore see no objection to granting the appellant such relief as will quiet him, in the permanent enjoyment of the water, to the extent it was used and enjoyed at the time he purchased from the respondent White. This is sufficiently certain and definite for a decree for a specific performance."

Judgment of *reversal, unanimously.*